**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JANUARY 15, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 15, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 103451-2 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| ANTHONY LEE, | ) | |
| | ) | Filed: January 15, 2026 |
| Petitioner. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.[*] – Our jurisprudence on double jeopardy continues

to be refined and clarified in this case. Anthony Lee was convicted of two counts of

second degree assault for beating Amy Groff in the head with a gun and then

shooting at her. This case affords us the opportunity to clarify our analysis of when

an action is a singular course of conduct. Additionally, we address Lee's argument,

raised for the first time on appeal, that the trial court judge made an impermissible

comment on the evidence. At trial, the court admitted certain statements that it said

---

[*] I would like to thank my law clerk Bailey Warrior Pahang for her contributions to this opinion.

were reliable as hearsay exceptions.

We affirm in part and reverse in part. With respect to the double jeopardy issue, we reverse and hold that the assaults were part of a singular unit of prosecution and constitute one course of conduct. The two convictions therefore violate double jeopardy. As for the comment on the evidence issue, we affirm and hold that Lee may not raise the issue for the first time on appeal because he has not demonstrated a manifest constitutional error.

FACTS AND PROCEDURAL HISTORY

A.     Factual Background

Lee and his wife lived on rural property near Sequim and U.S. Highway 101. Lee's friend Groff was staying with Lee and his wife at their home. One night, Lee and Groff went to a casino together to gamble for a while, and afterward they went to an apartment where Groff's friend lived. Groff was using controlled substances throughout the entire time. They returned to the casino, and then Lee left by himself and Groff remained there until closing.

When Lee returned to the casino to give Groff a ride home, Lee "seemed angry" with her and "started driving really recklessly and . . . swerving all over the place." 2 Verbatim Rep. of Proc. (VRP) (Jan. 31, 2023) at 476, 475. Groff testified that once they arrived at Lee's home, Lee got out of his truck and yelled at her to do the same. Groff stated that as she tried to gather her belongings, she could not move

2

fast enough for him, so he pulled out a gun and fired it in the air outside the truck. She said Lee hopped back into the truck, jumped over the center console, and hit her in the head with the gun multiple times. He then pushed her out of the truck, kicked and hit her in the head, and shot at her. Groff got up and ran and, as Groff was running down the driveway, Lee shot at her more.

A neighbor heard the gunshots and a woman sobbing and repeatedly screaming that she was leaving, then saw the woman walking toward Highway 101. The neighbor called the police, and shortly thereafter, a police officer found Groff walking along the highway with a swollen black eye and abrasions and bruising on her cheek and covered in debris. Groff told the police officer Lee had pulled her out of the vehicle, hit and kicked her, and shot at her.

Lee denied assaulting Groff and having a firearm but admitted to growing angry with Groff throughout the day. He stated that Groff took him to a "trap house" and used heroin around him, which gave him a headache. Ex. 78, at 7 min., 0 sec. to 7 min., 30 sec. Lee also said that Groff stole his wallet and was being verbally abusive to him. Lee told police, "I wanted her out of my vehicle; I wanted her out of my life." *Id.* at 14 min., 22 sec. to 14 min., 26 sec.

B.    Procedural History

The State charged Lee with two counts of second degree assault with a deadly

3

weapon.[2] The State alleged that the first assault count was for recklessly inflicting substantial bodily harm and the second was for using a firearm.

*1. Trial*

At the beginning of trial, the court instructed the jury not to be concerned with the reasons provided for its rulings. The court also gave the following instruction to jurors:

> Our state constitution prohibits a trial judge from making a comment on the evidence. Because it is your role to evaluate the evidence, it would be improper for me to express, by words or conduct, my personal opinion about the value of a particular witness's testimony or an exhibit. I will not intentionally do this. If it appears to you that I have indicated in any way my personal opinion concerning any evidence, you must disregard this entirely.

1 VRP (Jan. 30, 2023) at 281.

Later during the trial, the State sought to admit the police officer's testimony regarding Groff's statements to him. When defense counsel objected to the statements as hearsay, the State asserted the excited utterance hearsay exception, arguing that Groff was sobbing and her voice was shaking when the police officer found her on the highway, demonstrating that she was still under the stress of the recent event, which is a "key component" of whether there is "reliability" to constitute "a hearsay exception." 2 VRP (Jan. 31, 2023) at 417-18; *see* ER 803(a)(2).

---

[2] The State also charged Lee with one count of first degree unlawful possession of a firearm. That charge is not at issue before this court.

4

The trial judge allowed the statements; in his ruling, he stated while the jury remained in the courtroom "that the circumstances as described here are close enough in proximity and time to the . . . circumstances alleged to have occurred as to constitute . . . reliable statements for purposes of hearsay exceptions." 2 VRP (Jan. 31, 2023) at 418; 2 Clerk's Papers at 141. Defense counsel did not object to the ruling as a comment on the evidence at the time of the ruling or at any other time during the trial.

The police officer testified about what Groff told him when he encountered her walking along the highway. In addition to the officer's testimony, the jury heard Groff's recounting of the events as described above, as well as the testimony of neighbors who overheard the argument and gunshots. Before closing arguments, the trial court repeated its instructions that our state constitution prohibits comments on the evidence, and the jury must disregard entirely any appearance that the trial court gave a personal opinion about the evidence. Both instructions came from the pattern instructions each judge reads prior to and after trial, and the jury instructions were given to the jurors before they retired to deliberate.

*2. Judgment and Sentence*

The jury found Lee guilty as charged. At sentencing, the trial court found Lee's two assault convictions did not violate double jeopardy because it saw a clear separation between the acts that occurred: (1) "the beating with the gun" and

(2) "the firing of the weapon." 2 VRP (Feb. 21, 2023) at 723. The court acknowledged that the assaults occurred over a short period of time but concluded Lee's intent changed from the first assault to the second assault and he had time to think twice before firing the gun. Consequently, Lee was sentenced to 120 months of confinement.

### 3. Appeal

Lee appealed, arguing that the assault convictions violate double jeopardy principles because they arose from a single course of assaultive conduct. For the first time on appeal, Lee argued that the trial court impermissibly commented on the evidence when ruling on Lee's objection to the admission of the officer's testimony about Groff's statements.

The Court of Appeals affirmed the convictions. *State v. Lee*, 32 Wn. App. 2d 137, 141, 553 P.3d 740 (2024). The court held that Lee's two assault convictions did not violate double jeopardy. *Id.* at 158-59. The court underlined that while the assaultive acts took place over a short time in Lee's driveway without intervening acts or events and an opportunity to reconsider his actions, Lee's intent changed from one assault to another. *Id.* Namely, the first assault was predicated on Lee inflicting physical violence on Groff because he was angry at her and the second assault was predicated on Lee firing the pistol at Groff to scare her off of the property. *Id.* at 159.

Judge Che dissented on the double jeopardy issue, opining that the different intents between the two acts did not outweigh the other circumstances indicating that the assaults were part of the same course of conduct. *Id.* at 160 (Che, J., dissenting). The dissent would have concluded that under the totality of the circumstances, Lee's actions were part of a singular course of conduct because Lee intended to assault Groff, and the entire episode was motivated by his belief that Groff stole his wallet and his demand that she leave. *Id.* at 163 (Che, J., dissenting).

With respect to the comment on the evidence issue, the Court of Appeals unanimously held that Lee was not entitled to raise the judicial comment challenge for the first time on appeal under RAP 2.5(a). *Id.* at 146. The court explained that although the question was of constitutional magnitude, there was no manifest error because the trial court's statement did not amount to an impermissible comment on the evidence. *Id.* at 146-47. The court concluded that the trial court instead gave a reason for its ruling on defense counsel's hearsay objection, which is permissible. *Id.* at 148.

We granted review as to both issues.

## ANALYSIS

A.   Double Jeopardy

The constitutional prohibition on double jeopardy protects a person from

being "twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9; U.S. CONST. amend. V.[3] A person's double jeopardy rights include protection from receiving multiple punishments for multiple offenses that are the same in fact and in law. *State v. Peña Fuentes*, 179 Wn.2d 808, 824, 318 P.3d 257 (2014). However, if each count arises from a separate and distinct act, multiple convictions may stand. *Id.*

Our jurisprudence on double jeopardy and "same criminal conduct" has presented trial courts with a series of rules that can be easily confused. Thus, we take this opportunity to try to clarify some of the questions that have arisen from our cases. Double jeopardy and same criminal conduct are "separate, albeit similar, analyses" and a determination that a conviction does or does not violate double jeopardy does not compel the same conclusion as a "same criminal conduct" analysis under RCW 9.94A.589(1)(a). *State v. Chenoweth*, 185 Wn.2d 218, 222, 370 P.3d 6 (2016).

Calculating an offender score is where "same criminal conduct" issues arise. When a person is convicted and sentenced for multiple offenses, current offenses are generally counted separately toward the offender score. RCW 9.94A.589(1)(a). The Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, sets out an exception

---

[3] The state and federal double jeopardy clauses are given the same interpretation. *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995).

to that general rule: current offenses that "encompass the same criminal conduct" are counted as one crime at sentencing. RCW 9.94A.589(1)(a). The SRA defines "same criminal conduct" as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.* To ascertain whether crimes "require the same criminal intent" under that statute, courts must first look to the statutory intent of the crimes and "[i]f the objective intent for the offenses were the same or similar, courts can then look at whether the crimes furthered each other and were part of the same scheme or plan." *State v. Westwood*, 2 Wn.3d 157, 162-68, 534 P.3d 1162 (2023). We review determinations of same criminal conduct for abuse of discretion or misapplication of the law. *State v. Aldana Graciano*, 176 Wn.2d 531, 535, 295 P.3d 219 (2013).

As for the double jeopardy inquiry, we apply a different standard of review and review those claims de novo. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014) (citing *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009)). "The prohibition on double jeopardy generally means that a person cannot be prosecuted for the same offense after being acquitted, be prosecuted for the same offense after being convicted, or receive multiple punishments for the same offense." *Id.* at 980. Under the last principle regarding multiple punishments for the same offense, different double jeopardy analyses apply depending on whether the convictions at issue

involve the same statutory provision or different statutory provisions. *Id.* In cases involving convictions under different statutes (such as possession of drug paraphernalia and possession of a controlled substance with intent to deliver), we apply the *Blockburger*[4] analysis, which asks whether the convictions "are the same in law and in fact." *State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998) (citing *State v. Calle*, 125 Wn.2d 769, 777-78, 888 P.2d 155 (1995); *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995)). In cases involving multiple violations of the same statute (as in the instant case, two counts of second degree assault), we apply the "unit of prosecution" analysis, which asks "what act or course of conduct has the Legislature defined as the punishable act." *Id.* at 634 (citing *Bell v. United States*, 349 U.S. 81, 83-84, 75 S. Ct. 620, 99 L. Ed. 905 (1955); *In re Snow*, 120 U.S. 274, 7 S. Ct. 556, 30 L. Ed. 658 (1887)). The instant case raises the unit of prosecution test, which we apply here.

The distinctions between the "same criminal conduct" test—which derive from our state legislature's imprimatur—and the several double jeopardy analyses—which derive from the U.S. Constitution and federal law as well as our state constitution—often appear similar and result in confusion when applied. We have been attempting to clarify this court's approach to these analytical frameworks and continue to refine these distinctions as opportunities arise.

---

[4] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

This case raises a question about intent, and we apply a double jeopardy analysis here.

In this case, Lee was convicted of two violations of RCW 9A.36.021(1), which states, in relevant part, "A person is guilty of assault in the second degree if [the person], under circumstances not amounting to assault in the first degree: (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or . . . (c) Assaults another with a deadly weapon." "In determining whether the legislature intended assault to be a course of conduct offense or a separate act offense, we first turn to the statutory language." *Villanueva-Gonzalez*, 180 Wn.2d at 982 (citing *Adel*, 136 Wn.2d at 634-35). As there is no statutory definition of assault, we turn to the common law definition of assault. *Id.* (citing *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 504, 125 P.2d 681 (1942)). Our common law has recognized two definitions of assault: an attempt to cause bodily injury by unlawful force and an attempt to cause fear and apprehension of such injury. *State v. Byrd*, 125 Wn.2d 707, 712-13, 887 P.2d 396 (1995).

This court has determined that assault is a course of conduct crime, rather than a separate act offense. *Villanueva-Gonzalez*, 180 Wn.2d at 982. This forestalls the risk of an individual being "'convicted for every punch thrown in a fistfight.'" *Id.* at 985 (quoting *State v. Tili*, 139 Wn.2d 107, 116, 985 P.2d 365 (1999)). For double jeopardy purposes, multiple assaultive acts involve one "'unit

11

of prosecution'" when the acts arise from a common course of conduct.

*Id.* at 980-81 (quoting *Adel*, 136 Wn.2d at 634), 984. We have not adopted any

bright line test for what constitutes a single course of conduct when there are

multiple assaultive acts committed that raise this question.

Rather than a bright line test, we consider a number of factors, no single one

of which is dispositive:

- The length of time over which the assaultive acts took place,
- Whether the assaultive acts took place in the same location,
- The defendant's intent or motivation for the different assaultive acts,
- Whether the acts were uninterrupted or whether there were any intervening acts or events, and
- Whether there was an opportunity for the defendant to reconsider his or her actions.

*Id.* at 985-86 (finding two assault convictions for headbutting the victim and

grabbing her neck while holding her against furniture violated double jeopardy).

The ultimate determination depends on the totality of the circumstances, not

a mechanical balancing of the factors. *Id.* at 985.

Here, the parties do not dispute that Lee's actions took place over a short

time period in Lee's driveway, there were no intervening acts or events, and Lee

did not have the opportunity to reconsider his actions. Each of those

*Villanueva-Gonzalez* factors weigh in favor of finding both of Lee's acts

constitute one course of assaultive conduct. *Id.* at 985-86. The contention

between Lee and the State involves only the factor of the intent of the assaultive acts.

Lee asserts his actions were the result of "a singular impulse: [Lee's] anger at Groff and a corresponding desire for her to get away from him." Suppl. Br. of Pet'r at 25-26. The State, however, contends that "Lee's physical beating of Groff [was intended] to cause pain and hurt her," which "was a different assault from Lee's shooting at Groff with a firearm at a close range to get her to leave." Am. Suppl. Br. of Resp't at 17.

Even where two assaults may involve different intents, the assaultive acts may constitute the same course of conduct when the totality of the circumstances and the *Villanueva-Gonzalez* factors weigh overwhelmingly in favor of such a finding. *In re Pers. Restraint of White*, 1 Wn. App. 2d 788, 794, 407 P.3d 1173 (2017). The facts of this case bear some similarity to *White*. There, a disagreement about where White's child should live escalated when White pulled out a gun and threatened to kill his partner, Stevens, after she told him she would go to court if they could not reach a custody agreement. *Id.* at 790. White "grabbed Stevens by the hair, threw her face down on the floor, and began hitting her," repeatedly striking her on the back of the head and telling her she was going to die. *Id.* When Stevens tried to get up, White began to strangle her. *Id.* Stevens and White continued to struggle and grapple for the gun before they eventually both let go. *Id.* White blamed Stevens for the incident, slapped her, and threatened to kill her again. *Id.* at 790-91.

White was convicted of two counts of second degree assault for (1) pointing the gun at Stevens while threatening to kill her and (2) strangling Stevens. *Id.* at 793-94. White appealed, arguing that the two assault convictions violated double jeopardy. *Id.* Like the State in this case, the State argued on appeal that White's intent was not the same in the two assaults. *Id.* at 794. It asserted that the first assaultive act (threatening to kill Stevens while pointing the gun at her) was intended to create apprehension and fear of bodily injury, while the second (strangulation) was intended to inflict immediate physical harm. *Id.* The court rejected the State's argument that White had different intents for each of the assaults, as "[t]he acts occurred in a series during which White repeatedly expressed the intent to kill Stevens." *Id.* at 796. Applying the *Villanueva-Gonzalez* factors, the court found that "[t]he acts underlying White's convictions occurred in the same place, within a short period of time, in an uninterrupted series, with the stated intent of killing Stevens, and in response to Stevens' statement that she would pursue litigation if they could not agree on a parenting plan." *Id.* at 797-98. Ultimately, the court concluded that White's two assault convictions violated double jeopardy. *Id.* at 798.

The State in the instant case argues that *White* is distinguishable because at White's sentencing, the State conceded that both acts shared the same intent to commit an assault and that concession weighed heavily against the State

on appeal, whereas here, Lee's assaults were not counted as the same criminal conduct. Am. Suppl. Br. of Resp't at 14 (quoting *White*, 1 Wn. App. 2d at 794-95). As noted, the analyses for whether multiple convictions violate double jeopardy and whether they should be counted together or separately toward the offender score are distinct; this is not a same criminal conduct case. And although the Court of Appeals in *White* noted inconsistencies in the State's position regarding intent, there is no indication that such inconsistencies were the reason for the court ultimately concluding that White's assaults were one course of conduct. *White*, 1 Wn. App. 2d at 793-95. The court reviewed the issue of double jeopardy de novo, explaining that the facts showed that White had a consistent intent to kill Stevens when pointing the gun at her, beating her, and strangling her. *Id.* Consequently, the court found that White's intent and motivation did not change—"[h]e intended to assault Stevens and the episode as a whole was motivated by the disagreement over where [their child] would live." *Id.* at 795. Moreover, the *White* court considered intent as just one among the several *Villanueva-Gonzalez* factors weighing in favor of finding the assaults constituted the same course of conduct. *Id.* at 796; *accord Villanueva-Gonzalez*, 180 Wn.2d at 985 ("no one factor is dispositive").

Similarly, here, we find that Lee's intent and motivation did not change—he intended to assault Groff and the episode as a whole was motivated

by Lee's anger toward Groff and a corresponding desire for her to leave. *See Lee*, 32 Wn. App. 2d at 163 (Che, J., dissenting). In determining Lee's intent, we rely on what we *do* know, not what we *do not* know. Like in *White*, this includes what Lee has stated about his intent. 1 Wn. App. 2d at 797-98. On this record, we know that Lee grew angry with Groff throughout the day because Lee admitted that in his interview with the detective. This anger was based on Lee's belief that Groff gave him a headache by using heroin in his presence, stole his wallet, and belittled him. Groff similarly acknowledged that Lee appeared angry with her on the ride home, as evidenced by his erratic driving. Once they arrived home, Lee's built-up anger resulted in a corresponding desire for Groff to leave, as supported by Groff's testimony that upon arriving at Lee's home, Lee yelled at her to get out of his truck and Groff felt that Lee was angry she was not moving quickly enough. Though Lee wanted Groff to leave his truck, his desire for her to leave went beyond the confines of his vehicle and extended to his property as a whole, where Groff was living with him and his wife at the time. As Lee stated, "I wanted her out of my vehicle; I wanted her out of my life." Ex. 78, at 14 min., 22 sec. to 14 min., 26 sec. Based on these facts, Lee's anger and corresponding desire for Groff to leave was a culmination that had been building throughout the entire night, and his emotional state persisted throughout the course of the entire assaultive episode. *Cf. White*, 1 Wn. App. 2d at 795-96 (where repeated threats to kill persisted

throughout course of entire assaultive episode).

Moreover, in determining whether multiple assaultive acts constitute one course of conduct, no singular factor is dispositive. *Villanueva-Gonzalez*, 180 Wn.2d at 985. We must instead analyze the totality of the circumstances. *Id.* In doing so here, it is undisputed that all of the other *Villanueva-Gonzalez* factors weigh in favor of a double jeopardy violation—Lee's actions took place over a short time period in Lee's driveway, there were no intervening acts or events, and Lee did not have the opportunity to reconsider his actions. *Id.* at 985-86. A holding that multiple assaultive acts did *not* constitute one course of conduct solely on the basis of Lee's intent would treat that factor as dispositive, contrary to *Villanueva-Gonzalez*. We conclude Lee's intent did not change, and so all *Villanueva-Gonzalez* factors weigh in favor of finding a single course of conduct. But even if Lee's intent were a close call, *Villanueva-Gonzalez* directs us to consider the totality of the circumstances and the remaining factors overwhelmingly favor a finding of a singular course of conduct. Thus, we hold that based on the totality of the circumstances, Lee's two assaults constitute one course of conduct and thus the two convictions violate double jeopardy principles. We reverse as to this issue.

B. Comment on the Evidence

A jury should not be influenced by the trial judge's opinion of the evidence submitted. *State v. Swan*, 114 Wn.2d 613, 657, 790 P.2d 610 (1990).

17

Article IV, section 16 of the Washington State Constitution prohibits trial courts from commenting on the evidence. We review allegations of constitutional violations, including judicial comments on the evidence, de novo. *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012). In determining whether words or actions constitute a comment on the evidence, we must review the facts and circumstances of each case. *State v. Francisco*, 148 Wn. App. 168, 179, 199 P.3d 478, *review denied*, 166 Wn.2d 1027 (2009); *see also State v. Carpenter*, 52 Wn. App. 680, 687, 763 P.2d 455 (1988).

In this case, when counsel argued Groff's statements to the police officer were hearsay, the trial court remarked they were "reliable statements for purposes of hearsay exceptions" in ruling on their admissibility under the excited utterance exception. 2 VRP (Jan. 31, 2023) at 418. Lee did *not* object to this statement at trial. Instead, he argued for the first time on appeal that the trial court's statement was an impermissible comment on the evidence.

Generally, "[t]he appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). However, a party may raise an issue for the first time on appeal that involves "manifest error affecting a constitutional right." RAP 2.5(a)(3); *see also State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020). Manifest constitutional error requires a showing that (1) the issue affects an individual's constitutional rights *and*

18

(2) they suffered actual prejudice. *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001); *Guevara Diaz*, 11 Wn. App. 2d at 851. Under RAP 2.5(a)(3), we hold that there is no *manifest* error affecting a constitutional right. Although Lee's claim of error is constitutional in nature because the claim arises from a protection under the Washington State Constitution, the trial court's statement here does not warrant review for the first time on appeal because it does not amount to an impermissible comment on the evidence. Absent a timely objection, the trial court did not have the opportunity to provide a curative instruction, and, as explained below, the facts and circumstances of this case are insufficient to allow for meaningful appellate review. *Francisco*, 148 Wn. App. at 179; *see also Carpenter*, 52 Wn. App. at 687. We do not reach the inquiry as to whether Lee suffered actual prejudice.

A comment on the evidence is impermissible where it conveys to the jury the judge's personal attitudes toward the merits of the case or leads the jury to infer that the judge personally believed the testimony at issue. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006); *Swan*, 114 Wn.2d at 657. For the comment to be impermissible, the court's attitude toward the merits of the case must be "'reasonably inferable from the nature or manner of the questions asked and the things said.'" *State v. Brown*, 31 Wn.2d 475, 486, 197 P.2d 590 (1948) (quoting *Dennis v. McArthur*, 23 Wn.2d 33, 38, 158 P.2d 644 (1945)). "The touchstone of error in a trial court's comment on the evidence is whether the feeling of the trial

court as to the truth value of the testimony of a witness has been communicated to the jury." *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). The purpose of this prohibition is to prevent a trial judge's opinion of the evidence submitted influencing the jury's perception. *Swan*, 114 Wn.2d at 657. However, a trial court is required to make a clear record and has the authority to give reasons for its rulings on objections or admissibility of evidence. *State v. Cerny*, 78 Wn.2d 845, 855-56, 480 P.2d 199 (1971), *vacated in part on other grounds*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972).

Lee argues that the trial court's "ruling crossed the line into improper comment" by indicating a belief that Groff's statements to the police officer were "'reliable.'" Suppl. Br. of Pet'r at 12. Lee relies on *State v. Lampshire* for an example of where a judge's comment "'implicitly conveyed to the jury his personal opinion concerning the worth of the defendant's testimony.'" *Id.* at 11 (quoting *State v. Lampshire*, 74 Wn.2d 888, 892, 447 P.2d 727 (1968)). *Lampshire* is distinguishable. There, the defendant had already been given "wide latitude" to testify concerning the "bowel condition" of her daughter and visiting her mother with her sister. *Lampshire*, 74 Wn.2d at 892. The State objected on grounds of materiality, and the judge sustained the objection, remarking, "'Counsel's objection is well taken. We have been from bowel obstruction to sister Betsy, and I don't see the materiality, counsel.'" *Id.* at 891 (quoting record).

20

On appeal, the court held that the trial court's statement was a comment on the evidence and constituted prejudicial error because it improperly conveyed skepticism toward the credibility of the defendant's testimony. *Id.* at 892-93.

Measured against these principles, we find that the trial court's remark here does not cross the constitutional line into an impermissible comment on the evidence that would allow Lee to raise this for the first time on appeal. Unlike *Lampshire*, where the judge and jury had already heard the defendant's testimony in question *before* the judge commented on that testimony, *id.* at 892, the trial court's remark in the instant case—describing the admissibility of the police officer's testimony as "reliable statements for purposes of hearsay exceptions"—*preceded* the testimony of the police officer regarding Groff's statements to him. 2 VRP (Jan. 31, 2023) at 418.

Based on the timing of the ruling, it is reasonably inferable that the court provided a reason for the statements' *admissibility*, *not truthfulness*. *See Lane*, 125 Wn.2d at 838 (impermissible comment on the evidence occurs when a court makes a statement about "truth value" of testimony); *Brown*, 31 Wn.2d at 486 (court's attitude must be "reasonably inferable" from statement). The nature of the ruling being made *before* the testimony was heard reasonably indicates it was not made in relation to its substance; therefore, the ruling did not presumably speak to the court's perceived truth value of said testimony.

*Cf. Lampshire*, 74 Wn.2d at 891-93 (ruling made *after* testimony and related to substance of said testimony).[5] Moreover, the context of this ruling is consistent with the presumption that the court provided a reason for the statements' *admissibility* rather than the "truth value" of the testimony. *See Lane*, 125 Wn.2d at 838. The court specifically addressed the applicability of a hearsay exception, qualifying the reference to reliability "for purposes of hearsay exceptions." 2 VRP (Jan. 31, 2023) at 418.

This case is more akin to *Cerny*, 78 Wn.2d 845. There, Cerny objected to the State's circumstantial evidence, and the court stated that "'[t]he burden is on the [S]tate to tie this together.'" *Id.* at 855 (quoting record). In response to Cerny's further objections, the court said, "'I think the chain of evidence has been established.'" *Id.* (quoting record). This court held that those statements were not

___

[5] In *State v. Bogner*, Bogner appealed from his judgment and sentence for robbery based, in relevant part, on the assertion that the trial court made a comment on the evidence. 62 Wn.2d 247, 248-49, 382 P.2d 254 (1963). At trial, during the State's examination of a police officer, defense counsel objected to the officer's statement that the person who had committed the robbery had left the premises. *Id.* at 249. The trial judge asked whether defense counsel was denying that there was a robbery at that time and place and insisted that the parties were there to instead determine "'who did it, if anyone.'" *Id.* Defense counsel clarified that the "'twofold purpose'" of the case is "'to determine whether or not there was a robbery and . . . who committed the robbery.'" *Id.* The trial judge responded, "'Don't you think we are getting a little ridiculous, or aren't we?'" *Id.* This court held that the trial judge's statement constituted a comment on the evidence because it could have been understood by the jury as indicating the judge's belief that the State had already proved a robbery had been committed and the only remaining question to be decided by the jury was who committed it, relieving the State of its burden of proof. *Id.* at 254-55. *Bogner* is inapposite to our analysis. No party argues that the trial court's ruling relieved the State of its burden of proving second degree assault, and the ruling was not directly responsive to testimony or an objection to said testimony.

comments on the evidence, reasoning that a trial court, in response to objections to testimony, has the right to provide reasons for its rulings. *Id.* at 855-56. We further noted the trial court instructed the jury not to interpret anything the trial court said while ruling on objections as the judge's opinion, and we presume juries follow the court's instructions. *Id.* at 856.[6]

Here, the trial court similarly gave a reason for its ruling on defense counsel's hearsay exception to the police officer's testimony when making an evidentiary ruling. Viewed in context, the trial court's remark did not convey a belief that the statement was true or that the declarant was credible. It did not compare competing versions of events or indicate a preference for one party's account over another's. Nor did the court instruct the jury that the evidence in and of itself was reliable or should be given greater weight. Like the trial court in *Cerny*, the court's phrasing provided permissible, judicial explanation for its ruling on admissibility. *Id.* at 855-56. The trial court's statement was functionally indistinguishable from those routinely offered when courts rule on foundational issues—for example, accepting an expert witness or explaining why certain testimony is permitted. *E.g.*, *Swan*, 114 Wn.2d at 657-58 (trial court's statement it would "'accept [a doctor]

---

[6] Although general jury instructions do not cure an impermissible comment on the evidence made by a trial judge, where a ruling is *not* an impermissible comment and there is no error to cure—as in the instant case—we presume juries follow the court's instructions. *Compare Lampshire*, 74 Wn.2d at 892, *with Cerny*, 78 Wn.2d at 856.

as an expert'" on child abuse was a "'threshold'" ruling—a ruling addressing the threshold question of admissibility as the doctor possessed the qualifications to be considered an expert (quoting record)). In addition, like the trial court in *Cerny*, the trial court here also twice instructed the jury to disregard entirely any appearance that the trial court gave a personal opinion about the evidence. And again, we presume juries follow the court's instructions. *Cerny*, 78 Wn.2d at 856.

Lee also asserts that "the judge did not need to comment on reliability in making his ruling" because reliability "is not actually a factor in evaluating whether out-of-court statements meet the exception." Suppl. Br. of Pet'r at 13 (citing ER 803(a)(2)). While Lee is correct that the excited utterance exception does not list "reliability" as a formal element under ER 803(a)(2), Washington law acknowledges the theory underlying the exception—that statements made under the stress of a startling event are inherently trustworthy and reliable because such "stressful circumstances are believed to operate to temporarily overcome the ability to reflect and consciously fabricate." *State v. Dixon*, 37 Wn. App. 867, 872, 684 P.2d 725 (1984). The trial judge's use of the term "reliable," though not legally necessary, reflected this underlying rationale and did not suggest a personal belief in the declarant's credibility.

Although it would have been more prudent for the trial court to abstain from using the word "reliable" in its admissibility ruling, we find that based on the context

of the statement being "for purposes of hearsay exceptions" and the timing of the statement taking place before the police officer testified as to Groff's out-of-court statements to him, the trial court's remark did not amount to an impermissible comment on the evidence. Instead, we hold that the trial court provided a reason for its admissibility ruling, which is permissible. *Cerny*, 78 Wn.2d at 855-56. Thus, Lee has not shown a manifest constitutional error and may not raise this issue for the first time on appeal under RAP 2.5(a)(3). We affirm as to this issue.

CONCLUSION

We affirm in part and reverse in part. First, we find that under the totality of the circumstances, Lee's two assault convictions violate double jeopardy principles. It is undisputed that Lee's actions took place over a short time period and in the same place, there were no intervening acts or events, and Lee did not have the opportunity to reconsider his actions. On the undisputed facts alone, we conclude that Lee's two assaults constitute one course of conduct. As to the sole factor in dispute, Lee's intent, this record supports a finding that Lee's anger and corresponding desire for Groff to leave motivated the entire assaultive episode. Therefore, the two assault convictions for the same course of conduct violate double jeopardy. We reverse as to that issue and remand to the trial court with instructions to vacate one count of assault and the accompanying firearm enhancement and

to resentence Lee on the remaining conviction.

Second, we find that the trial court's statement in the jury's presence that Groff's statements to the police officer were "reliable statements for purposes of hearsay exceptions" did not amount to an impermissible comment on the evidence. Thus, we hold that there is no manifest constitutional error that would permit Lee to raise this argument for the first time on appeal under RAP 2.5(a)(3) and affirm as to that issue.

_____
Montoya-Lewis, J.

WE CONCUR:

_____
Stephens, C.J.

_____

_____
Johnson, J.

_____
Madsen, J.

_____
Whitener, J.

_____
González, J.

_____
Yu, J.P.T.

*State v. Lee*

No. 103451-2

MUNGIA, J. (dissenting in part)—A hallmark of our legal system is trial by jury—and not just any jury, but a fair, unbiased, and impartial jury.

The trial judge is the authority figure in the courtroom. The judge is set off from everyone else, elevated on the bench, and clothed in a black robe. The judge is addressed as "your honor." Everyone stands when the judge enters and exits the courtroom. People sit only after being given permission to do so by the judge.

Jurors are reminded of the authority the judge has over the courtroom. The attorneys ask permission to approach the bench or to approach a witness. The attorneys stand when addressing the judge. When an objection is made by an attorney, the judge is the authority that decides whether to sustain or overrule it.

A judge has the ability, either intentionally or unintentionally, to influence how the jury views the evidence. The influence can be subtle: a look of incredulity when a witness testifies, a lack of patience with one party as opposed to the other, or a harsher tone of voice when speaking to a party.

Recognizing the power imbalance in the courtroom, our state's constitution is clear that a judge is not allowed to act in a way that may influence a jury.

Here, the trial judge, in ruling on an objection, stated in front of the jury that the alleged victim's statements to the officer were "reliable statements for purposes of hearsay exceptions." 2 Verbatim Rep. of Proc. (VRP) (Jan. 31, 2023) at 418. The majority holds that the trial court's statement was not an impermissible comment on the evidence. Majority at 18. I disagree. The jury heard the trial judge, the authority in the courtroom, tell the lawyers that the alleged victim's statement was reliable. That statement, while no doubt accidentally made, violates our state constitution's strict prohibition on a trial judge biasing the jury by commenting on matters of fact.

Accordingly, I respectfully dissent in part.[1]

I.     IT IS CRITICAL THAT JUDGES REFRAIN FROM COMMENTING ON THE EVIDENCE

> Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.

WASH. CONST. art. IV, § 16.

Our constitutional prohibition against judges commenting on the evidence is unique among all the states. For over 100 years, our courts have recognized that jurors will look to statements made by a judge that would favor a party or vouch for the credibility of a witness.

> There are different ways by which a judge may comment upon the testimony, within the meaning of the constitution referred to above. The object of the constitutional provision, doubtless, is to prevent the jury from

---

[1] I join in the majority's holding on double jeopardy.

2

being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. The constitution has made the jury the sole judge of the weight of the testimony and of the credibility of the witnesses, and it is a fact well and universally known by courts and practitioners that the ordinary juror is always anxious to obtain the opinion of the court on matters which are submitted to [their] discretion, and that such opinion, if known to the juror, has a great influence upon the final determination of the issues. This information can be conveyed as readily to the jury by leading questions asked of them, and the manner of the judge in asking such questions, as by a direct comment upon the testimony in the charge to the jury. . . . There is no other constitution that we have been able to find that is as prohibitive of the action of the court in this respect as ours. Most of them are to the effect that the judge shall not charge the jury in respect to matters of fact. Ours, it will be noticed, goes beyond that, and provides that they shall not comment thereon; indicating by its very language that comments could be indulged in by the court otherwise than by its charge to the jury.

*State v. Crotts*, 22 Wash. 245, 250-51, 60 P. 403 (1900).

We have zealously enforced this constitutional prohibition by examining whether a judge's statements could have influenced a juror's decision.

In *State v. Bogner*, 62 Wn.2d 247, 382 P.2d 254 (1963), we held that a trial judge commented on the evidence and that the comment was prejudicial error. There, the defendant was charged with robbery. *Id.* at 248. A man with a handkerchief over his face robbed an office at gunpoint. *Id.* Freddie Bogner's car was seen driving away from the area. *Id.* Mr. Bogner was stopped with a sack of money and a gun in his car. *Id.* Mr. Bogner claimed that he had been parked when someone ran by and threw the sack of money and the gun into his car and that he panicked and drove off. *Id.*

At trial, the defense objected to a question the State posed to the police officer. *Id.* at 249. The trial judge interrupted and asked the defense attorney whether the defense

3

was denying that a robbery took place. *Id*. The defense attorney responded that the case involved two basic questions: whether there was a robbery and, if so, who committed the robbery. *Id*. At that point, the trial judge replied, "'Don't you think we are getting a little ridiculous, or aren't we?'" *Id*. (quoting record).

Strictly speaking, the judge did not directly comment on the evidence. He simply asked a question. But we held that the judge's question was a comment on the evidence that certainly could have influenced the jury. The judge asked how could the defense even question that a robbery had been committed? Yet the State had the burden of proving that essential fact. We held that the comment violated art. IV, § 16. We concluded:

> We cannot say that it affirmatively appears that the jury could not have been influenced by the comments of the trial judge. We hold that the violation of Art. 4, § 16, of the Washington Constitution constituted reversible error in this case.

*Id*. at 256. Thus, the court's test for whether a statement is a comment on the evidence is whether the jury *could* have been unduly influenced by it.

In *Bogner*, we also stated that we use a stringent test to determine whether this comment on the evidence prejudiced the defendant:

> Even if the evidence commented upon is undisputed, or 'overwhelming,' a comment by the trial court, in violation of the constitutional injunction, is reversible error unless it is apparent that the remark could not have influenced the jury.

*Id*. at 252. We noted that this strict rule for assessing prejudice had been part of our precedent since the late 1800s. *See id.* at 253 (collecting cases).

4

While the test we use to assess prejudice has shifted since *Bogner*, we have not retreated from the strict standard to which we hold judges. In *State v. Lane*, 125 Wn.2d 825, 889 P.2d 929 (1995), we assessed prejudice by considering whether the untainted evidence overwhelmingly supported each element of each count against the defendants. There, Jeffrey Lane, Wayne Anderson, and Jonathon Woods were accused of, among other crimes, murdering Eva Wolfe. *Id*. at 827-28. The case went to trial. *Id*. at 830. A key witness against Mr. Lane and Mr. Anderson was William Blake. *Id*. at 835. Mr. Blake had been incarcerated in jail with the two defendants waiting to be tried. *Id*. Mr. Blake testified that Mr. Lane and Mr. Anderson told him how they had murdered the victim and that they did so for revenge. *Id*. at 835-36.

The defense attempted to impeach Mr. Blake. *Id*. at 836. Mr. Blake had been serving a six-month sentence for forgery, but his sentence was reduced to three months. *Id*. Mr. Blake testified he did not make any deals with the State. *Id*. However, a defense witness testified that Mr. Blake admitted he told the authorities what they wanted to hear, that his early release from jail was because of his cooperation with the police, and that he expected to be paid $800 for his testimony. *Id*.

Over the objections of both the parties, the trial judge said the following to the jury:

> "The sentence of William Blake was reduced to three months confinement and release date of June 8, 1988 given. The reasons advanced by the prosecutor and accepted by the judge related to Mr. Blake's safety and an inadvertent disclosure near [*sic*] of Mr. Blake's cooperation with authorities given to an unidentified person. Whether that last statement proves or does not prove anything is a matter for the jurors.

5

> "Now instruction on the law. The testimony of Mr. Blake regarding prior statements of Mr. Anderson may be considered by you in determining Mr. Anderson's credibility and for no other purpose."

*Id*. at 837 (quoting record). Thus, the trial judge commented on the credibility of the witness by stating that he "accepted" the prosecutor's explanation for why Mr. Blake was transferred.

The jury found all three defendants guilty of murder, among other crimes. *Id*. at 830. All three appealed. *Id*. The Court of Appeals held that the trial court erred in admitting certain evidence under ER 404(b) and by commenting on the evidence. The State and Mr. Woods petitioned for review in this court, which was accepted. *Id*. at 831.

We held that the trial court violated art. IV, § 16. *Id*. at 839. We stated that a trial judge's statement is a comment on the evidence if the trial court's opinion "as to the truth value of the testimony of a witness has been communicated to the jury." *Id*. at 838. We reiterated that the "purpose of prohibiting judicial comments on the evidence is to prevent the trial judge's opinion from influencing the jury." *Id*.

We held that if a judge has commented on the evidence, the reviewing court will presume that the comments were prejudicial. *Id*. The burden then rests on the State to show that the comments did not prejudice the defendant, unless the record affirmatively shows that the defendant was not prejudiced. *Id*. at 838-39.

We noted the strict prejudice rule articulated in *Bogner*—even when the evidence of guilt is overwhelming, reversal is required unless it is apparent that the comment could not have influenced the jury. *Id*. at 839. However, instead we applied the constitutional

6

harmless error standard from *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985): whether overwhelming untainted evidence supported Mr. Wood's conviction.[2] We concluded it did. We accordingly held that the trial court's comment was harmless beyond a reasonable doubt. *Lane*, 125 Wn.2d at 840.

Although we sub silentio overruled *Bogner*'s strict prejudice test, even under the *Guloy* test the State must prove beyond a reasonable doubt that the error was harmless. *Guloy*, 140 Wn.2d at 425. Any reasonable jury must have reached the same result even without the trial judge's impermissible comment. *Id*.

## II.     THE TRIAL JUDGE COMMENTED ON THE EVIDENCE

Applying these rules to the case before us, the judge impermissibly commented on the evidence. Here, in defense counsel's opening statement, he told the jury that there was a lack of physical evidence. No gun was ever found. 1 VRP (Jan. 30, 2022) at 295-96. No bullets were found. *Id*. at 296. While two 9 mm shell casings were found, there were no fingerprints or DNA found on them. *Id*. Defense counsel told the jury that a witness familiar with guns heard a .22 caliber gun being fired, not a 9 mm gun. *Id*.

The defense framed the case as one in which Ms. Groff's testimony was the only testimony linking Mr. Lee to a gun. He argued to the jury that they could not rely on Ms. Groff's testimony.

---

[2] *State v. Magana-Arevalo*, No. 103586-1 (Wash. Jan. 15, 2026), clarifies that the constitutional harmless error test requires a court to consider both (1) the corrosive impact of the constitutional error and (2) the strength of the properly admitted evidence of guilt. *Id.*, slip op. at 43-44.

You'll—the only evidence that State's going to have to put a firearm in Mr. Lee's hands is going to be the words of Ms. Groff. It's going to be inconsistent with the evidence, it's not going to be reliable.

*Id*. at 297.

As noted by the majority, most of the key evidence against Mr. Lee came from Ms. Groff. Thus, Ms. Groff's credibility was central to the trial.

The State told the court that Ms. Groff was going to testify at the trial. Nonetheless, the State sought to introduce statements that Ms. Groff told to Officer Dixon, the police officer who responded to Ms. Groff's call. 2 VRP at 405, 412-13. These out-of-court statements offered for the truth of the matter asserted were, by definition, hearsay and inadmissible unless they fell within an exception to the hearsay rule.

The following testimony set up the admission of the hearsay statements, the objections, and the court's statements that were made in the presence of the jury.

Q. [STATE]: What happened next?

A. [OFFICER DIXON]: I asked her, I says are you okay. She tells me no. And I asked her were you assaulted—

Q. [DEFENSE]: Objection, hearsay.

THE COURT: Well, he's already—he's already testified as to that, he's just repeating his earlier testimony.

[STATE]: And Your Honor, I would also say, um, just for the purposes of this it's an excited utterance since, um, it's clear that the person Deputy Dixon's talking to is still under the stress (sic) of the moment.

THE COURT: Okay, well, but we already—you already elicited this testimony and there was no objection, so—

8

[STATE]: Yep, all right—

THE COURT: —go ahead.

Q. [STATE]: Um, and you said that she was crying—

A. [OFFICER DIXON]: She was crying—

Q. —right—

A. —and her eyes were, like, blackening.

Q. Okay. And did you notice anything else about her at that point?

A. And there's—she looked like there could be some swelling.

Q. Swelling where?

A. Um, on her face.

Q. Did you notice anything about her clothes at that time?

A. Yeah, she had debris on her clothes, looked like grass and stuff.

Q. So she says she's been assaulted?

A. Uh-huh.

Q. And then what's the next thing that happens?

A. I asked her to get into the car, and I seatbelted her in. And then she started telling me briefly what had occurred.

Q. Okay. And this is still while she's in the car?

A. While she's in the car.

Q. All right. What's her emotion—

A. She's talking through the window and I—you know, I usually keep my window locked but she wasn't a suspect, she's a victim so I cracked the window so she could talk to me.

Q. All right, so, um, Deputy Dixon, at the point that she's in the car, what was her emotional state?

A. She was very upset. She was crying. She appeared frightened.

Q. When you say that she appeared frightened, what physically was she doing?

A. Oh, she was shaking and crying as she was talking to me.

Q. Like visibly shaking?

A. Hard to describe because it was really dark—

Q. Uh-huh.

A. Yeah, her voice was like quaking.

Q. Her voice was quaking?

A. Yeah, as I recall.

Q. Okay.

[STATE]: And Your Honor, at this time I'm going to ask about what the person in the car said and I'm going to ask that it be (inaudible) as an excited utterance.

THE COURT: [Defense counsel]?

[DEFENSE]: Um, I think (inaudible) if I could ask a question of the witness to clarify—if I could voir dire—

[STATE]: No objection.

THE COURT: Go ahead.

Q. [DEFENSE]: About what time, uh, do you know it was when you, um, picked her up there?

A. [OFFICER DIXON]: I left my house about—right after 5:00 o'clock [sic], and like I said, it—you know, I'm driving at a reasonable rate of speed, um maybe ten minutes from when I signed in to when I picked her up. I didn't check my time.

Q. Um, if I provide you with an incident report and with the CAD [(computer aided dispatch)] report attached, would that help you remember about what time it was?

A. The CAD report?

Q. Yeah.

A. Um, I will look at it. Um—okay. 5:38—okay, yeah, it says I made contact—

THE COURT: Okay, just use that to refresh your memory and then when your memory is refreshed you can hand it back to [defense counsel] and he can ask some questions for you.

THE WITNESS: Okay.

Q. [DEFENSE]: Has your memory refreshed, you know what time it was?

A. [OFFICER DIXON]: According to the CAD notes it says it was 5:38, that sounds about right.

Q. That's about a half hour from when you originally left (sic)?

A. I think so.

Q. Okay.

[DEFENSE]: Um, so—yes, nothing further, Your Honor.

THE COURT: Okay, so [the prosecution] is proposing to elicit testimony from this witness as to statements made to him by the woman he made contact with.

11

. . . .

[DEFENSE]: And, um—and Your Honor, (completely inaudible)—can consider on excited utterance is proximity to—to the incident being described, right. This is an excited utterance based on—of when stress occurred—(completely inaudible)—we've heard testimony that an incident occurred sometime between 2:00 in the morning and 4:20 so if we take that 4:20 time, we're still talking about over an hour, um, from the excited incident that—that is being discussed. And I think that sort of—you know, even if that—even if this woman was still upset, it's not—you know, it's not the sort of excited utterance of things that just occurred (completely inaudible).

. . . .

THE COURT: Okay, [defense counsel], thank you. [Prosecutor]?

[STATE]: So, Your Honor, I think . . . . we're still close in proximity in time, Ms. Groff is still in the area of the incident. She's by the side of the highway, she's still clearly under the stress of the event. Um, her voice is quaking still at this point, she is visibly sobbing. Um, and when it comes to an excited utterance, being under the—still being under the stress of the event is a key component of—of the analysis of whether, uh, there's, um, that reliability here that makes it a hearsay exception.

So with that in mind, Your Honor, I would ask that the statement be admitted.

THE COURT: Okay . . . . I do believe that the circumstances as described here are close enough in proximity and time to the, uh, circumstances alleged to have occurred as to constitute, uh, reliable statements for purposes of hearsay exceptions. So I'm going to allow the statements.

[STATE]: Thank you—

[DEFENSE]: Your Honor, I'm going to renew my record—my objection for the record.

THE COURT: Understood, understood. Thank you.

12

2 VRP at 412-18.

The majority holds that the timing and context of this ruling shows that the judge's statement pertained to admissibility, not truthfulness, and therefore it was not a comment on the evidence. Majority at 21. I disagree. The trial judge's statement was a comment that easily could have influenced the jury's evaluation of the credibility of this key witness.

The majority argues that there are four reasons that the trial judge's statement did not violate art. IV, § 16. Their reasoning fails on each count.

1. *The Phrase "for Hearsay Purposes" Does Not Prevent This Statement from Influencing the Jury*

There would be no dispute that if a trial judge were to state, in front of a jury, that a certain witness's testimony is reliable, that that would be an impermissible comment on the evidence. The question here is whether the statement ceases to be a comment on the evidence by adding the phrase "for purposes of hearsay."

It does not.

From the juror's perspective, the judge told the attorneys that the alleged victim's statement to the police was reliable. The judge would not make that pronouncement unless the judge thought the alleged victim's statement was truthful—if it was a false statement, it would not be a statement that could be relied on. If this statement is reliable, then likely the judge believes that the alleged victim is someone who tells the truth and that the jury can likewise believe her testimony.

13

This is the danger of a judge's comment, statement, or action—that the jury will be influenced by the authority figure in the courtroom.

The central question raised by the majority's analysis is whether jurors can hear the qualifying phrase "for purposes of hearsay" and correctly interpret that "reliable" does not refer to the content of the statement but to admissibility.

While a trial lawyer would likely reach that conclusion, overwhelmingly jurors are not lawyers. They do not know the definition of hearsay, much less know the exceptions to the hearsay rule. In this case, at best, a juror may think that normally the judge would not allow the officer to repeat what the alleged victim told him, but that the judge permitted it here because the statement is reliable, in other words, truthful.

A judge vouching for the reliability, or truthfulness, of a witness, violates art. IV, § 16, is unfair to the parties, and taints the judicial process.

2. *General Jury Instructions Do Not Cure the Misconduct*

The majority suggests that the general jury instructions that the trial judge gave at the beginning and end of the trial somehow cured this comment on the evidence. Majority at 22.

This reasoning is flawed for three reasons.

First, instructions given only at the beginning and end of trial are too attenuated to cure an improper comment. It is important to note that the trial court's "improper comment" instruction is only a small portion of its opening instructions to the jury. The following is the entire instruction:

14

THE COURT: So I'm going to explain the procedure to be followed during trial.

First, the State's lawyer may make an opening statement outlining the testimony of witnesses or other evidence that he expects to be presented on behalf of the State's case. The Defense lawyer may then make an opening statement outlining the Defendant's case immediately after the State's statement, or may reserve opening statements until the conclusion of the State's case.

Second, the State will introduce evidence. At the conclusion of the State's evidence, the Defendant may, but need not, present the testimony of witnesses or other evidence. Each witness who testifies may be cross-examined by the other side and rebuttal evidence may also be introduced by either side.

Third, at the conclusion of all the evidence I will instruct you on what law applies to this case. I will read the instructions to you and you will have a copy of the instructions in the jury room during your deliberations.

After the instructions are read to you the lawyers will have the opportunity to make closing arguments.

Finally, you will be taken to the jury room by the bailiff where you will select a presiding juror. The presiding juror will preside over your discussions of the case, which are called deliberations. You will then deliberate in order to reach a decision, which is called a verdict. Until you are in the jury room for those deliberations, you must not discuss the case with the other jurors or with anyone else, or remain within hearing of anyone discussing it.

It is your duty as a jury to decide the facts in this case based upon the evidence presented to you during the trial. Evidence is a legal term and it includes testimony of witnesses, documents, and physical objects.

It also is your duty to accept the law from my instructions, regardless of what you personally believe the law is or what you think it ought to be. You are to apply the law from my instructions to the facts, and in this way decide the case.

The only evidence you are to consider consists of testimony of witnesses and exhibits admitted into evidence. When witnesses testify,

15

please listen very carefully. You will need to remember testimony during your deliberations because testimony will rarely, if ever, be repeated for you. Any exhibits admitted into evidence will go to the jury room with you during your deliberations.

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. However, the lawyers' statements are not evidence or the law. The evidence is the testimony and the exhibits and the law that applies as contained in my instructions to you. You must disregard anything the lawyers say that is at odds with the evidence or the law in my instructions.

You may hear objections made by the lawyers during trial. Each party has the right to object to questions asked by another lawyer, and may have a duty to do so. These objections should not influence you. Do not make any assumptions or draw any conclusions based on a lawyer's objections.

One of my duties as judge is to decide whether or not evidence should be admitted during this trial. What this means is that I must decide whether or not you should consider evidence offered by the parties. For example, if a party offers a photograph as an exhibit, I will decide whether it is admissible. Do not be concerned about the reasons for my rulings. You must not consider or discuss any evidence that I do not admit or that I tell you to disregard.

Our state constitution prohibits a trial judge from making a comment on the evidence. Because it is your role to evaluate the evidence, it would be improper for me to express, by words or conduct, my personal opinion about the value of a particular witness's testimony or an exhibit. I will not intentionally do this. If it appears to you that I have indicated in any way my personal opinion concerning any evidence, you must disregard this entirely.

You will be allowed to take notes during the trial. Whether or not you do so is entirely your own decision. If you do choose to take notes, you should make sure that it does not interfere with your ability to listen to and observe the witnesses.

A notepad and a writing utensil will be provided to each of you. Your juror number will be on the front page of the note pad. You must take notes on this pad only and not on any other paper. You must not take your note pad from the courtroom or the jury room for any reason. When you

16

recess during the trial, please leave your notebook on your chair. While you are away from the courtroom or the jury room, no one else will read your notes.

You must not discuss your notes with anyone or show your notes to anyone until you begin deliberating on your verdict. This includes other jurors. During deliberation, you may discuss your notes with the other jurors or show your notes to them.

You are not to assume that your notes are necessarily more accurate than your memory. You are allowed to take notes to assist you in remembering clearly, not to substitute for your memory. You are also not to assume that your notes are more accurate than the memories or notes of the other jurors.

After you have reached a verdict, your notes will be collected and destroyed by the bailiff. No one will be allowed to read them.

Throughout this trial, you must come and go directly from the jury room. Do not remain in the hall or courtroom unless otherwise instructed, as witnesses and parties may not recognize you as a juror, and you may accidentally overhear some discussion about this case. And please note the lawyers, parties and witnesses are prohibited from talking to you during trial.

It is essential to a fair trial that everything you learn about this case comes to you in this courtroom, and only in this courtroom. You must not allow yourself to be exposed to any outside information about this case, including from your family and friends. Do not permit anyone to discuss or comment about it in your presence, and do not remain within hearing of such conversations. You must keep your mind free of outside influences so that your decision will be based entirely on the evidence presented during the trial and on my instructions to you about the law.

Until you are dismissed at the end of this trial, you must avoid outside sources such as newspapers, magazines, the internet, social media or other sources which may discuss this case or issues involved in this trial. If you start to hear or read information about anything related to the case, you must act immediately so that you no longer hear or see it. If you become aware that you or another juror has been exposed to outside information, you must privately notify the bailiff. Do not discuss these matters with other jurors.

By giving this instruction I do not mean to suggest that this particular case is newsworthy; I give this instruction in every case.

During the trial, do not try to determine on your own what the law is. Do not seek out any evidence on your own. Do not conduct any research into the facts, the issues, or the people involved in this case. You must keep your mind clear of anything that is not presented to you in this courtroom.

During the trial, do not provide information about the case to other people, including any of the lawyers, parties, witnesses, your friends, members of your family, or members of the media. If necessary, you may tell people such as your employer or your child's daycare provider that you are a juror and let them know when you need to be in court. If people ask you for more details, you should tell them that you are not allowed to talk about the case until it is over.

If you become exposed to any information other than what you learn in the courtroom, it could be grounds for a mistrial. A mistrial would mean that all of the work that you and your fellow jurors put into this trial will be wasted. Retrials are costly and burdensome to the parties and the public. Also, if you communicate with others in violation of my orders, you could be fined or held in contempt of court.

Remember that all phones, laptops, and other electronic devices must be turned off and may not be used while you are in court and while you are in deliberations.

As jurors, you are officers of this court. As such, you must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference.

To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a just and proper verdict.

To accomplish a fair trial takes work, commitment, and cooperation. A fair trial is possible only with a serious and continuous effort by each one of us.

Thank you for your willingness to serve this court and our system of justice.

1 VRP at 278-85.

18

At the end of the trial, the relevant paragraph is an even smaller portion of the court's instructions to a jury.

I agree with the majority that we presume that a jury follows the trial court's instructions.[3] However, it cannot be our law that a trial judge's comment on the evidence is cured by giving general instructions at the beginning and at the end of trial. Realistically, it is unlikely jurors will recall this one paragraph in the sea of opening instructions. And it is even less likely that every juror will recall the instruction several days into a trial.

More importantly, the comment made by the trial judge here likely subconsciously affected the jurors by conveying that Ms. Groff is a reliable person and so her testimony is reliable and thus believable. That is the very risk that our state constitution was intended to guard against.

Second, the majority relies on *State v. Cerny*, 78 Wn.2d 845, 480 P.2d 199 (1971), *vacated in part on other grounds*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972), for its conclusion that general introductory jury instructions may cure a judge's comment. The *Cerny* opinion is not particularly helpful in analyzing whether a trial judge's comment violates art. IV, § 16. The opinion devotes one paragraph to this issue. There,

---

[3] In my view, that presumption is strongest when the jury is deliberating, is trying to decide the key issues, and has the written jury instructions in front of them. I do not find it realistic to expect a jury to recall all of the court's introductory instructions as the trial proceeds. The jury does not have a copy of the introductory written instructions to review before the start of each day of trial. The jury does not take notes during the time the court is giving the introductory instructions.

defense counsel objected to circumstantial evidence sought to be introduced by the prosecutor. In ruling on this objection, the trial judge replied, "'The state will have to tie it up.'" *Id*. at 855 (quoting record). Later, the trial judge, in response to a further objection, responded, "'I think the chain of evidence has been established.'" *Id*. (quoting record). We determined that the trial court's statement "I think the chain of evidence has been established" was not a comment on the evidence. We then added the following:

> The jury in the instant case was instructed that the trial court can have no opinion on the facts of the case and that anything said by the court during the trial on objections must not be taken as an opinion of the court as to the facts of the case or as expressing any opinions of the court thereon. The jury is presumed to have followed the court's instruction.

*Id*. at 856.

The court did not explain the significance of the jury instruction to its analysis. The court had already determined that the statement "I think the chain of evidence has been established" was not an impermissible comment on the evidence. Its acknowledgment of the jury instruction was not necessary to its holding. Moreover, I do not read *Cerny* as ruling that an otherwise impermissible comment on the evidence can be cured by either a general opening jury instruction or a general closing jury instruction. I believe the above-cited portion of the *Cerny* opinion was at most dicta, and bad dicta at that. We should not only disavow but strongly disavow the notion that general jury instructions given at the beginning and end of trial will cure, or remedy, an improper comment made by the trial judge.

Third, we expressly rejected the argument that general jury instructions cure an improper comment in *State v. Lampshire*, 74 Wn.2d 888, 447 P.2d 727 (1968). There, we held that the trial judge's comment undermined the credibility of the defendant's testimony. *Id*. at 892. The State argued that any impermissible comment was cured by the jury instruction given at the end of trial before the jury began deliberating. *Id*. We rejected that argument.

> The state argues that the trial court was merely giving its reasons for a ruling on the evidence, and that, if the remark was error, the error was cured by the court's subsequent oral instruction to the jury to disregard comments of court and counsel. We disagree. Under the facts here, the damage was done when the remark was made and it was not capable of being cured by a subsequent instruction to disregard.

*Id*.

We should reiterate our holding in *Lampshire* that a general instruction given at the end, or beginning, of trial does not cure a judge's violation of art. IV, § 16.

3. *The Trial Judge Explaining a Ruling on an Objection Does Not Excuse the Misconduct*

The majority reasons that the judge did not comment on the evidence because the trial judge was explaining his ruling. While a trial judge has the right to explain their ruling, that does not give them license to comment on the evidence.

Here, the statement made by the trial court, that Ms. Groff's statement was reliable, is not even part of the test for admitting hearsay under the excited utterance exception. ER 803(a)(2). Instead, to be admissible under that exception, the proponent must show that the statement related to a startling event and was made while the person

21

was still under the stress of excitement caused by the event. *Id*. The trial judge is not tasked with deciding whether the statement itself is reliable.

The majority excuses the trial judge's mistaken belief that reliability is a factor in the excited utterance test by noting the theory underlying this exception: that stressful circumstances produce reliable statements. Majority at 24. While the majority is correct that this logic underlies the exception, that does not give the court license to make such a statement to the jury. In other words, a trial judge would not be allowed to explain to the jury that they are admitting hearsay testimony because, under an exception, the law presumes that the hearsay testimony is reliable. This longer explanation of the court's ruling would influence the jury's perception of the witness's credibility, just as the judge's actual comment did here.

Trial judges routinely admonish lawyers for making speaking objections. This is because a speaking objection may allow an attorney to improperly influence the jury. Trial judges must be held to that same standard and for the same reason: to avoid biasing a jury.

What is alarming here is not only the comment by the trial judge that Ms. Groff's statement was reliable but also the amount of colloquy that took place in front of the jury about this objection. The danger of allowing extended arguments concerning an objection in front of the jury is that the jury may be influenced by statements made by the attorneys or, as in this case, the judge.

22

It is not difficult to prevent inadvertent, impermissible comments from being made in front of the jury when objections arise. The easiest way to prevent this is to excuse the jury so that a full argument can be made. In fact, the trial judge did that when the prosecutor asked that the jury be excused to discuss a potential witness's testimony. 2 VRP at 634.

Another option is for the trial court to hold a sidebar, listen to arguments, and then simply sustain or overrule the objection on the record. At the next court break, the judge can then recount what was discussed at the sidebar after the jury leaves the courtroom.

Regardless of what process is used, the requirements of art. IV, § 16 always take priority.

4. *The Timing of the Trial Judge's Comment Does Not Excuse the Violation*

The majority acknowledges that in *State v. Lampshire* we held the trial judge's comment violated art. IV, § 16. Majority at 20. However, the majority attempts to distinguish the comments here because the judge made them before the witness testified:

> Unlike *Lampshire*, where the judge and jury had already heard the defendant's testimony in question *before* the judge commented on that testimony, the trial court's remark in the instant case—describing the admissibility of the police officer's testimony as "reliable statements for purposes of hearsay exceptions"—*preceded* the testimony of the police officer regarding Groff's statements to him.

*Id*. at 20-21 (citation omitted).

The majority does not explain why it would make a difference that the comment came before the testimony as opposed to after the testimony or why that would prevent the statement from being a comment on the evidence. It does not. It is irrelevant whether

23

a trial judge's comment comes before or after a witness testifies. A judge violates art. IV, § 16 when they state, in front of the jury, that a witness's statement is reliable.

Here, the jury heard the judge first state that Ms. Groff's statements were reliable, aka truthful, and then saw Ms. Groff take the stand. The risk was high that the judge's statement could influence how the jury would perceive Ms. Groff's truthfulness when she testified.

The majority's attempt to distinguish *Lampshire* fails. In *Lampshire*, Martha Lampshire was convicted of five counts of the crime of carnal knowledge. 74 Wn.2d at 889. Because of the nature of the evidence, the trial pitted Ms. Lampshire's credibility against the credibility of a 16-year-old witness and three youths who testified that they had intercourse with her. *Id.* at 890-91.

That case did not involve the trial judge's comment about the evidence but instead his comment about why he sustained an objection. *Id.* at 891. When Ms. Lampshire was on direct examination, the State objected to the testimony on the basis of materiality. *Id.* Instead of simply sustaining the objection, the trial judge made the following comment:

> Counsel's objection is well taken. We have been from bowel obstruction to sister Betsy, and I don't see the materiality, counsel.

*Id.*

The trial judge did not explicitly make a statement about a witness. Instead, his comment ran the risk that the jury would feel his frustration with the defense counsel's questioning. This in turn ran the risk that the jury would believe that the trial judge was siding with the State's case. We held that this violated art. IV, § 16:

24

We are satisfied that the remark of the trial judge was made inadvertently in ruling on the motion. Nevertheless, the remark implicitly conveyed to the jury his personal opinion concerning the worth of the defendant's testimony.

*Id*. at 892.

As noted earlier, we rejected the State's argument that the court's instruction to the jury after the close of evidence cured this improper comment.

In short, none of the majority's arguments support its position that the trial judge's statement here did not violate art. IV, § 16.

III.    THE JUDGE'S COMMENT ON THE EVIDENCE WAS PREJUDICIAL TO THE DEFENDANT

As discussed above, first we analyze whether a statement or action by a trial judge violated art. IV, § 16.  The standard we use to make that determination is not whether it in fact did influence a jury or even whether it likely influenced a jury.  Instead, the standard is whether the statement or action could have influenced the jury.  This low bar is not only appropriate but necessary to ensure that the protections of art. IV, § 16 are enforced.

When we conclude that a trial judge violated art. IV, § 16, we then apply the constitutional harmless error test to determine the appropriate remedy.  That two-part test requires that we consider both the corrosive impact of the constitutional error and the strength of the properly admitted evidence of guilt.[4]

---

[4] *See Magana-Arevalo*, No. 103586-1, slip op. at 43-44.

(1) The corrosive impact of the trial judge's comment was substantial. Ms. Groff was the State's key witness. The trial judge's comment about the reliability of her statement could have influenced the jury in its evaluation of all of Ms. Groff's testimony. All of her testimony was tainted by the trial judge's statement.

(2) To evaluate the strength of the properly admitted evidence of guilt, a reviewing court would need to be convinced beyond a reasonable doubt that any reasonable jury would have reached the same result, even without the impermissible comment by the trial judge. While there was evidence that Mr. Lee assaulted Ms. Groff, no physical evidence or other testimony supported the assault with a deadly weapon charge. Without Ms. Groff's testimony, it is not reasonable to say that Mr. Lee would have been convicted of assault with a deadly weapon.

In conclusion, the trial judge's comment was prejudicial to Mr. Lee to the same extent as if the judge told the jury, "I think Ms. Groff is a credible witness." While the latter statement is more explicit, both statements violate art. IV, § 16.

## IV. CONCLUSION

Our courts have rules and procedures to ensure that if a person finds themself on trial, they will be treated fairly and equally. These rules are not only for the litigants' benefit at trial but also for the entire community's trust in the legal system.

If a party believes that a particular judge cannot fairly preside over a case, they can move to have the judge recuse themself. A judge will recuse themself not only where they believe that they may be biased but also where there could be a perception of bias.

We do not merely seat the first 12 people from the jury pool to sit on the jury. Instead, we question them to ensure that they can decide the case fairly without bias in favor of either party. In addition, we allow parties a certain number of peremptory strikes so that the parties can feel assured that the jury process is a fair one.

During trial, we instruct the lawyers that they cannot talk to the jurors when they see them in the hallways. We do so to protect against a juror being biased in favor of a party and to avoid the appearance of juror bias.

Having a fair and unbiased jury is critical to a jury trial. The amount of influence the trial judge has over the jury cannot be overstated. These considerations must always be in the forefront when analyzing an issue under art. IV, § 16. As we recognized 125 years ago:

> [t]he object of the constitutional provision, doubtless, is to prevent the jury from being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. . . . There is no other constitution that we have been able to find that is as prohibitive of the action of the court in this respect as ours.

*Crotts*, 22 Wash. at 250-51.

I fear that the majority has lost sight of these principles. I fear that the majority is not zealously guarding against the dangers of a trial judge's influence, whether intentional or accidental, on a jury. We must stay vigilant in ensuring that our jury trials remain fair and impartial.

I respectfully dissent in part.

27

_____
Mungia, J.

_____
Gordon McCloud, J.